UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------X

E.H., individually, and E.H. on behalf
of M.K.,

                    Plaintiff,

                                              15 Civ. 3535 (RWS)
                                                   OPINION

    - against -


NEW YORK CITY DEPARTMENT OF EDUCATION,

                    Defendant.

------------------------------------------X

**Sweet, D.J.**


          ATTORNEY FOR PLAINTIFF
          LAWRENCE D. WEINBERG
          162 Williamson Avenue
          Bloomfield, NJ 07003
          By: Lawrence D. Weinberg, Esq.


          ATTORNEYS FOR DEFENDANT
          NEW YORK CITY LAW DEPARTMENT
          100 Church Street
          New York, NY 10007
          By:  Elizabeth C. Degori, Esq.

1

**Sweet, D.J.**

Plaintiff E.H, individually (the "Plaintiff" or the "Parent") and on behalf of their son M.K. (the "Student"), have moved pursuant to Federal Rule of Civil Procedure 56 for summary judgment granting tuition reimbursement for M.K.'s unilateral placement for the 2012-2013 school year and reversal of the decision of the State Review Officer ("SRO"). Defendant Department of Education of the City of New York (the "DOE" or "Defendant") has cross-moved under the same rule for summary judgment dismissing Plaintiff's complaint. Based on the conclusions set forth below, Plaintiff's motion is granted and Defendant's motion is denied.

## I.  Prior Proceedings

The instant motions concern the adequacy of an Individualized Education Program ("IEP") offered by the DOE to provide a Free Appropriate Public Education ("FAPE") for M.K. for the 2012-2013 school year pursuant to the Individuals with Disabilities Education Improvement Act ("IDEA"). The case was initiated by a request for an Impartial Hearing filed on the Parent's behalf July 10, 2012. Administrative Record in Office

2

of State Review Appeal No. 14-407[1]: Department of Education
Exhibits 1-9, Ex. 1. An amended demand for due process was filed
by the Parent on September 4, 2012. Record: Administrative
Decisions, Ex. B: Decision No. 14-407 of the State Review
Officer, Jan. 16, 2015 at 3 ("SRO Decision"). At the first stage
of administrative adjudication, on March 4, 2014, the Impartial
Hearing Officer ("IHO") found in the Parent's favor. Record:
Administrative Decisions, Ex. A: Findings of Fact and Decision
of Impartial Hearing Officer Timothy M. Mahoney, Esq., Case No.
139782 March 4, 2014 at 3-4 ("IHO Decision"). The DOE appealed,
and on January 16, 2015, the State Review Officer ("SRO")
overturned the IHO's decision and sustained the appeal in the
DOE's favor.

Plaintiff filed a Complaint in this Court on May 6, 2015
seeking reimbursement of M.K.'s tuition expenses for the 2012-
2013 school year and reversal of the SRO Decision. Plaintiff's
motion for summary judgment was filed October 9, 2015.
Defendant's cross-motion for summary judgment was filed on
November 16, 2015. Oral argument was heard and the motions
deemed fully submitted on January 14, 2016.

---

[1] All citations hereinafter other than to the parties' pleadings
are to this Administrative Record.

3

## II. **The Facts**

The following facts are derived from the parties' filings and the administrative record and are not in dispute except as noted below.

M.K. is an 11 year old with autism. Since the 2009-2010 school year, M.K. has attended the Rebecca School, a private year-round school that specializes in serving students with neurodevelopmental delays such as Autism Spectrum Disorder. For each year, the Parent has sought tuition reimbursement pursuant to the DOE's obligation under the IDEA to provide a free appropriate public education for every child.[2]

On June 21, 2012, in undergoing its annual review, the DOE convened a Committee on Special Education ("CSE") to develop an IEP for M.K.'s 2012-2013 school year. The CSE team reviewed a December 2011 progress report from the Rebecca School, a classroom observation of M.K., and a neuropsychological report.

---

[2] Tuition for the 2009-2010 school year was settled between the parties. Tuition for the 2010-2011 school year was awarded to the Parent by an IHO, and was not appealed. Tuition for the 2011-2012 school year was awarded to the Parent by an IHO, and appealed. The instant motion concerns the 2012-2013 school year. Tuition for the 2013-2014 and 2014-2015 school years was settled between the parties. As of the time Plaintiff's instant motion was submitted, tuition for the 2015-2016 school year was before an IHO.

4

The CSE created an IEP for M.K. for the 2012-2013 school year with thirteen goals addressing M.K.'s social, behavioral, academic, occupational therapy, speech, and language therapy needs. As discussed more thoroughly below, the parties disagree about whether the IEP appropriately addresses M.K.'s needs consistent with the IDEA.

By Final Notice of Recommendation letter ("FNR") dated Thursday, June 28, 2012, the DOE offered M.K. placement at P168X in the Bronx. The IEP had an implementation date of Monday July 2, 2012.[3]  On Friday, June 29, 2012, the Parent signed a contract with the Rebecca School. The School countersigned on July 2, 2012. Plaintiff filed an impartial hearing request on July 9, 2012 (amended September 4, 2012). The Parent was unable to visit P168X until July 13, 2012. On July 17, 2012, the Parent notified the DOE by letter that M.K. would remain at the Rebecca School.

Before the IHO, Plaintiff alleged two procedural and several substantive defects of the IEP in contravention of the IDEA. Procedurally, plaintiff alleged failure to evaluate M.K. for three years and untimeliness of the IEP and FNR.

---

[3] July 2, 2012 was the first day of the school year and is the date of implementation on the IEP. Instruction at the Rebecca School began July 2, 2012. Instruction at P168X began July 5, 2012.

5

Substantively, Plaintiff alleged the IEP was inappropriate for the following reasons: (i) failing to adopt the Rebecca School methodology while adopting the Rebecca School goals; (ii) recommendation of a class size of 6:1:1[4]; (iii) providing goals based on a December 2011 progress report without accounting for M.K.'s progress since; (iv) lack of a Behavior Intervention Plan ("BIP"), which was never provided to the Parent; (v) the BIP presented at the hearing was inaccurate and inappropriate; (vi) failure to reference M.K.'s sensory diet; (vii) lack of a plan to transition M.K. from the Rebecca School to P168X; and (viii) substantive inappropriateness of the program at P168X.

Four hearings were held before the IHO between December 3, 2012 and October 17, 2013. The IHO issued a decision on March 4, 2014 with the following findings: "(a) the DOE failed to meet its burden in demonstrating the student was offered a free appropriate public education . . . for the 2012-2013 school year; that (b) the parents are entitled to an award of tuition reimbursement for the costs of their unilateral placement; and that (c) the equities support the parent's claim." IHO Decision at 3. The IHO found the IEP was substantively inadequate for

---

[4] The ratio's format expressed in three numbers indicate students:teachers:paraprofessionals. Ratios expressed in two numbers are students:teachers.

6

adopting the Rebecca School goals without consideration of appropriate methodology and for relying on the December 2011 progress report without consideration of M.K.'s progress since. The IHO also found the BIP substantively inadequate. Procedurally, the IHO found the CSE failed to permit the Parent to meaningfully participate by failing to consider a more supportive placement than 6:1:1, and that both the IEP and FNR failed to provide the Parent with sufficient notice.

The DOE appealed each of the IHO's adverse findings to the State Review Officer on April 8, 2014. The SRO sustained the District's appeal, finding as follows: (i) the Parent's participation in the CSE was adequate; (ii) the IEP goals appropriate; (iii) the BIP appropriate; and (iv) the IHO inappropriately ruled the FNR untimely for failing to meet the Jose P. v. Ambach consent decree. Accordingly, the SRO held the IEP provided M.K. a FAPE for the 2012-2013 school year. Plaintiff filed the instant action seeking reversal of the SRO's decision.

**III. Applicable Standards**

**A.    The IDEA**

The IDEA exists to "ensure that all children with
disabilities have available to them a free appropriate public
education . . . designed to meet their unique needs." 20 U.S.C.
§ 1400(d)(1)(A). To effectuate the statute, "States have an
affirmative obligation to provide for a basic floor of
opportunity for all children with disabilities," defined as "an
education likely to produce progress not regression, and one
that affords the student with an opportunity greater than mere
trivial advancement." T.K. v. N.Y.C. Dep't of Educ., No. 14-
3078-CV, 2016 WL 229842, at *3 (2d Cir. Jan. 20, 2016) (quoting
M.O. v. N.Y.C. Dep't of Educ., 793 F.3d 236, 239 (2d Cir. 2015))
(internal quotation marks omitted).

"The centerpiece of the IDEA and its principal mechanism
for achieving this goal is the IEP." Id. (citing Murphy v.
Arlington Cent. Sch. Dist. Bd. of Educ., 297 F.3d 195, 197 (2d
Cir. 2002)) (internal quotation marks omitted). The IEP
addresses the child's present level of academic and functional
performance, a statement of measurable annual goals designed to
improve those current levels, and provides a plan to meet them.

20 U.S.C. § 1414(d). "Where the IEP is substantively deficient, parents may unilaterally reject it in favor of sending their child to private school and seek tuition reimbursement from the State." T.K., 2016 WL 229842 at *3 (citing 20 U.S.C. § 1412(a)(10)(C)(ii); Frank G. v. Bd. of Educ. of Hyde Park, 459 F.3d 356, 363 (2d Cir. 2006)). Procedural deficiency can also justify reimbursement for unilateral placement if the violations "significantly impede the parents' participations rights, impede the child's right to a FAPE, or cause a deprivation of educational benefits." Id. at *4.

"Although the parties style the procedure to dispose of IDEA actions as a motion for summary judgment, the procedure is in substance an appeal from an administrative decision." T.K., 2016 WL 229842, at *7. Federal review of IDEA determinations proceeds as follows:

> First, the court asks whether the State complied with the procedures set forth in the Act. Second, the court asks whether the IEP developed through the Act's procedures is reasonably calculated to enable the child to receive educational benefits. If an IEP is deficient—either procedurally or substantively—the court then asks whether the private schooling obtained by the parents [for the child] is appropriate to the child's needs. In answering this third question, equitable considerations relating to the reasonableness of the action taken by the parents are relevant.

M.H. v. New York City Dep't of Educ., 685 F.3d 217, 245 (2d Cir.

2012) (citations and internal quotation marks and brackets

9

omitted).

Federal courts reviewing administrative determinations under the IDEA "must engage in an independent review of the administrative record and make a determination based on a preponderance of the evidence." Id. at 240 (citing Gagliardo v. Arlington Cent. Sch. Dist., 489 F.3d 105, 112 (2d Cir. 2007)) (internal quotation marks omitted). The Court must also consider "any further evidence presented before the District Court by the parties" not presented to the SRO. Grim v. Rhinebeck Cent. Sch. Dist., 346 F.3d 377, 380 (2d Cir. 2003). As the Supreme Court has concluded, this review of the record is "by no means an invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities which they review." Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist., Westchester Cty. v. Rowley, 458 U.S. 176, 206, 102 S.Ct. 3034, 73 L.Ed.2d 690 (1982); Walczak v. Florida Union Free Sch. Dist., 142 F.3d 119, 129 (2d Cir. 1998).

Because "the role of the federal courts in reviewing state educational decisions under the [IDEA] is circumscribed," the district court should not disturb the SRO's decision if it "is thorough, well-reasoned, and based on the record." D.A.B. v. New York City Dep't of Educ., No. 14-4119-CV, 2015 WL 7273409, at *1

10

(2d Cir. Nov. 18, 2015) (citing R.E. v. New York City Dep't of Educ., 694 F.3d 167, 189 (2d Cir. 2012); Grim v. Rhinebeck Cent. Sch. Dist., 346 F.3d 377, 380-81 (2d Cir. 2003); Walczak, 142 F.3d at 129); see also Gagliardo, 489 F.3d at 112-14; A.C. v. Bd. of Educ., 553 F.3d 165, 171 (2d Cir. 2009).

By statute, reviewing courts afford such deference via application of the preponderance standard. 20 U.S.C. § 1415(i)(2)(C)(iii). However, the preponderance standard does not alone capture precisely how much deference to apply, when to apply more or less, and to whom. As between the conflicting opinions of an IHO and SRO, the reviewing federal court is generally required to defer to the SRO. See M.H., 685 F.3d at 246. Conversely, where "the SRO's determinations are insufficiently reasoned to merit that deference, and in particular where the SRO rejects a more thorough and carefully considered decision of an IHO, it is entirely appropriate for the court, having in its turn found the SRO's conclusions unpersuasive even after appropriate deference is paid, to consider the IHO's analysis, which is also informed by greater educational expertise than that of judges, rather than to rely exclusively on its own less informed educational judgment." Id.

These inquiries ultimately translate to a review of the

11

persuasiveness of the SRO's decision. Id. at 244. However, the persuasive inquiry "must also be colored by an acute awareness of institutional competence and role," id., "mindful that the judiciary generally lacks the specialized knowledge and experience necessary to resolve persistent and difficult questions of educational policy." Walczak, 142 F.3d at 129 (quoting Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist., Westchester Cty. v. Rowley, 458 U.S. 176, 206, 208 102 S. Ct. 3034, 3050, 3052 73 L. Ed. 2d 690 (1982)).

Different types of findings are also accorded different degrees of deference. The SRO's findings regarding the IEP's substantive adequacy command more deference than determinations regarding whether the IEP was developed according to proper IDEA procedures. M.H., 685 F.3d at 246; see also M.P v. Carmel Cent. Sch. Dist., No. 15 CV 3432 (VB), 2016 WL 379765, at *4 (S.D.N.Y. Jan. 29, 2016) ("Courts should afford more weight to SRO determinations when they involve the substantive adequacy of an IEP."). Determinations of appropriate methodology are accorded greater deference, while factual determinations of progress are afforded less. M.H., 685 F.3d at 246. Finally, more deference is due when this Court's determination rests solely on the same evidence presented to the SRO. Id.

12

With these all these standards in mind, the Court approaches the findings, reasoning, and persuasiveness of the SRO's opinion.

**IV.  Plaintiff's Motion for Summary Judgment is Granted and the Decision of the SRO is Reversed**

    **A.   The IEP was Not Appropriate For M.K.**

        **1.   The State Failed to Comply with the Procedures Set Forth in the IDEA**

Plaintiff argues four procedural inadequacies: (1) the IEP was untimely, thus denying the Parent appropriate notice as required by the IDEA; (2) the IEP did not include an FBA and BIP, and the IEP was procedurally inappropriate without it; and (3) the BIP was substantively inadequate, and thus the IEP was inappropriate; (4) the IEP was predetermined, and the Parent was deprived of meaningful participation in the development of the IEP process. Pl.'s Mem. of Law in Supp. Mot. Summ. J. ("Pl.'s MSJ"). Each argument will be addressed in turn.

**a)** **The DOE Failed to Timely Provide Notice of Placement Change**

With respect to the timeliness of the IEP, Plaintiff argues that the late date of the IEP meeting (held June 21, 2012) and FNR (dated June 28, 2012) together deprived the Parent of adequate notice. Pl.'s MSJ at 12. The DOE argues that an IEP need not indicate a particular school site, the choice of a particular school is an administrative decision, and therefore any timing issues did not interfere with provision of a FAPE. Def.'s Mem. of Law in Supp. Mot. Summ. J. at 18-20 ("Def.'s MSJ"). The IDEA requires prior written notice be provided to the parent whenever the district proposes a placement change, 20 U.S.C. § 1415(b)(3)(A), (c)(1), while both New York State and federal regulations command that such notice must be provided "a reasonable time before" any change to placement. 34 C.F.R. § 300.503(a)(1); 8 N.Y. Comp. Codes R. & Regs. § 200.1(oo) ("NYCRR").

The DOE suggests that the standard only requires that the IEP be "in effect at the beginning of the school year." Def.'s MSJ at 20; Def.'s Opp. at 2. SRO Decision at 14. The Court agrees, pursuant to statute, the IEP must be in effect at the beginning of each school year. See 34 C.F.R. § 300.323. However,

14

notice and effect are not synonymous, hence the separate
sections. The fact of the Section 300.323 in effect requirement
does not negate, nullify, or otherwise overrule the separate
reasonable notice requirement. See 20 U.S.C. § 1415(b)(3)(A),
(c)(1); 34 C.F.R. § 300.503(a)(1).

The SRO applied the "in effect" standard, finding that
"although [the FNR] did not provide a significant amount of time
for the parents to consider the public school option prior to
the start of the 2012-2013 school year, it is not a basis for
finding a denial of FAPE." SRO Decision at 14-15. The SRO
overturned the IHO's finding on this issue on the basis that the
IHO found the untimeliness deprived M.K. of a FAPE for violating
the consent decree reviewed in Jose P. v. Ambach, 669 F.2d 865,
867 (2d Cir. 1982), and neither the IHO nor SRO had jurisdiction
to resolve a dispute involving the consent decree. SRO Decision
at 14-16.

As a procedural determination, the SRO is entitled to a
lower degree of deference on this issue. M.H., 685 F.3d at 246.
Furthermore, with the exception of the conclusion quoted above
and a single citation, the SRO did not analyze or substantively
discuss whether the timeliness of the IEP and FNR met the
"reasonable time" notice requirement. The SRO's discussion of

15

the timeliness of the DOE's conduct does not so much as say the word "reasonable." Accordingly, the SRO's conclusion is not persuasive and does not command deference, as the analysis did not bring reason to bear on whether the notice of a change of placement was provided within a reasonable time and is based on federal case law rather than the record. See D.A.B., 2015 WL 7273409, at *1 (citations omitted); see also SRO Decision at 14-16.

The Jose P. consent decree requires children in a twelve-month school year must be provided with a placement notice on or before June 15.[5] Pl.'s MSJ at 13. The DOE's internal rules similarly provide that a new placement notice be provided by June 15. Standard Operating Procedures Manual: The Referral, Evaluation, and Placement of School-Age Students with Disabilities, at 137. Irrespective of whether the Jose P. consent decree applies to Plaintiff, the considered judgment of approving court in Jose P. and of the DOE in its own internal procedures manual, and particularly the confluence of both, say a great deal about what can be considered a reasonable amount of notice to afford a Parent of a new placement location. The DOE

---

[5] Defendant does not argue this requirement exists, but challenges that the Jose P. consent decree applies to this action. Def.'s MSJ at 20.

not only failed to provide notice of placement by June 15, the IEP was not held until more than a week later. Affording the DOE the greatest benefit of any doubt, the notice of placement was written, mailed, received, and read by the Parent on Thursday, June 28, 2012 for a school year to begin the following Monday.

Even assuming the placement was substantively adequate and the Parent had no right to visit the placement to evaluate it or compile a notice of rejection, as the DOE argues, a single business day is not a reasonable amount of notice. Adoption of the DOE's position would render the reasonableness requirement irrelevant. If one business day and a weekend constitute a reasonable period, nothing short of no effective notice whatsoever could be deemed insufficient.

That the first day of instruction at P168X was June 5, 2012 does not alter the conclusion. First, the DOE cannot rely on the later date of the placement choice when the very issue is that the Parent was not notified in advance of the placement choice. Second, and most importantly, the IEP's implementation date is July 2, 2012. Pl.'s Ex. J at 1 ("IEP"). The DOE set this implementation date, and cannot now escape its deadline. As reasoned above, the Court agrees and defers to the IHO's conclusion that "the DOE's failure to timely provide the parents

17

with an IEP and placement notification did in fact deny the parents the ability to properly participate in the development of an appropriate education plan for M.K." Id. at 13.

By indicating that such a period must exist by statute and that it must be reasonable, Congress clearly envisioned some amount of time more than a single business day. It is unreasonable to expect that a child needing effectively constant adult care could be slotted in to a new class in a new place with new instructors and peers on the notice of a handful of days (at most). That an IEP need not designate a placement with the IEP, as the DOE rightly cites, is all the more reason to hold the IEP meeting sufficiently in advance of the school year, consistent with the DOE's own standard operating procedure. The combination of M.K.'s IEP held June 21, the FNR written June 28 and received thereafter, and a school year beginning July 2 does not provide reasonable notice of a change of placement consistent with the IDEA's procedural safeguards.

### b)    Inclusion of BIP

With respect to the inclusion of an FBA and BIP, the Parent alleges neither were never received and thus cannot be considered part of the IEP. Pl.'s MSJ at 15. "New York

18

regulations require the department to conduct an FBA for a student whose behavior impedes his or her learning or that of others." R.E., 694 F.3d at 190 (citing 8 NYCRR § 200.4(b)(1)(v)). Likewise, "[w]hen a student's behavior impedes his learning, a BIP must be developed with strategies to deal with the problem behavior(s)." Id.

The DOE argues that the Court should not consider this issue, as it was not raised in Plaintiff's Due Process Complaint. Def.'s MSJ at 16. "This Court lacks subject matter jurisdiction to consider any claim that has not been exhausted pursuant to the IDEA's administrative review process—that is, it may not consider any issues that were not considered by the IHO in the due process hearing." N.K. v. New York City Dep't of Educ., 961 F. Supp. 2d 577, 584 (S.D.N.Y. 2013). The DOE states "the DOE did not have sufficient notice of the substance of this issue, and [thus] it is not properly before this Court." Def.'s MSJ at 17 (citing Pl.'s Ex. C).

A review of the record shows this claim was not specifically pled in the Due Process Complaint. Both the initially filed Due Process Complaint and the Amended iteration state the following:

f. The IEP . . . did not address all of the student's

        unique social/emotional and behavioral needs.
                i. The team did not present any reports to the parent
                prior to the meeting.
        Pl.'s Ex. A at 3, ¶ f(i); Pl.'s Ex. C at 3, ¶ f(i).


        Plaintiff's argument is that "the FBA and BIP could not be
considered part of the IEP," because the FBA and BIP were
created after the IEP rather than with or before it, and thus
"[w]ithout the FBA and BIP the IEP was not appropriate." Pl.'s
MSJ at 16. What the Parent did allege in the Due Process
Complaint — that the BIP and FBA were not received before the
IEP — does not demand the necessary conclusion that the IEP
cannot be considered to include the FBA and BIP.[6] More was
required to suggest the Parent intended to argue that conclusion
before the IHO.


        Notwithstanding the IHO's finding a failure to timely
provide the FBA and BIP, "[f]ailure to exhaust the
administrative remedies deprives the court of subject matter
jurisdiction." Cave v. E. Meadow Union Free Sch. Dist., 514 F.3d
240, 245 (2d Cir. 2008). Given that this argument was not raised
in Plaintiff's Due Process Complaint, the issue is not exhausted
and the Court is barred from reaching it.

---

[6] It is undisputed that an FBA and BIP were created at some
point. Dr. Czarnecki, a DOE psychologist, testified that they
were written after the IEP. Jan. 28, 2013 Tr. at 98:6-99:2.

### c)     Adequacy of the BIP

The Parent also argues the BIP was substantively inadequate

for its reliance on a paraprofessional to decrease M.K.'s

aggression. Pl.'s Opp./Reply at 5. In short, Plaintiff relies on

Ms. Mucherino's testimony to explain that M.K.'s aggressive

behavior stems from his inability to communicate.[7] Id. The BIP

does not at all address improving M.K.'s communication, and thus

fails to adequately address behavioral M.K.'s needs. Id. New

York regulations require a BIP to be quite detailed, and must

include:

> (i) the baseline measure of the problem behavior, including
> the frequency, duration, intensity and/or latency of the
> targeted behaviors. Such baseline shall, to the extent
> practicable, include data taken across activities,
> settings, people and times of the day. The baseline data
> shall be used as a standard to establish performance
> criteria and against which to evaluate intervention
> effectiveness;
> (ii) the intervention strategies to be used to alter
> antecedent events to prevent the occurrence of the
> behavior, teach individual alternative and adaptive
> behaviors to the student, and provide consequences for the
> targeted inappropriate behavior(s) and alternative
> acceptable behavior(s); and
> (iii) a schedule to measure the effectiveness of the
> interventions, including the frequency, duration and
> intensity of the targeted behaviors at scheduled intervals.

8 NYCRR § 200.2(b)(4).

---

[7] Ms. Mucherino was M.K.'s classroom teacher at the Rebecca
School.

21

The IHO and SRO each addressed this topic at length, both
finding the BIP did not adequately addressed behavioral needs.
The IHO found as follows:

[T]he BIP fails to adequately describe M.K.'s behaviors.
Ms. Mucherino testified that the BIP failed to describe the
issues M.K. had with frustration arising from his
communication deficits as a key precursor for his negative
behaviors, nor the full description of the aggressive
behaviors he was presently exhibiting in the classroom. ...
In reviewing the record, I agree.
IHO Decision at 10. The SRO agreed with the IHO's

determinations, though ultimately concluded "a holistic review
of the June 2012 IEP, FBA, and BIP supports the district's
argument." SRO Decision at 12.

Analyzing the substantive adequacy of the BIP, the SRO
found "[t]he BIP ... falls far short of the standards for BIPs
set forth in State regulations. ... Therefore, I agree with the
parents and the IHO that the district's failure to develop an
adequate BIP constituted a procedural violation of the IDEA."
SRO Decision at 13-14. Nonetheless, the SRO found that the
support system identified in the IEP and the behavioral
assessment included in the FBA together overcame the
insufficiency of the BIP. SRO Decision at 14.

The Court defers to the SRO's assessment that the BIP was

22

inadequate, amounting to a procedural violation.[8] Some of M.K.'s most salient difficulties that impede his educational progress stem from behavioral issues.[9] Accordingly, the inadequate content of the BIP wrought a uniquely harmful result on M.K. in particular, denying him a FAPE.

### d) Predetermination

Plaintiff argues that the CSE failed to consider the Parent's viewpoint that M.K. needed a more restrictive setting of 2:1. Pl.'s MSJ at 16-18. The Parent alleges that the placement choice was made irrespective of the Parent's objection to the appropriateness of a less restrictive setting than 2:1, and thus the Parent was deprived of meaningful participation in the IEP. Id.

---

[8] As reasoned herein, not all of the SRO's procedural conclusions merit the same deference. Accordingly, the Court cannot defer to the SRO's balancing of the weight of the aforementioned procedural violations. The significance of the procedural violations will be analyzed after all the Parent's procedural arguments are addressed.

[9] For example, regulation, a behavioral condition, is a foundational element of all other progress for M.K.. When M.K. becomes dysregulated, he is clearly in a severe state of discomfort and frustration and is unable to process information within his environment. Pl.'s MSJ at 28; Jan. 30, 2013 Tr. at 113:9-116:12. M.K. is therefore unable to productively engage, learn, or benefit from any educational program when he is in a state of dysregulation.

23

Predetermination is inconsistent with the goals of the IDEA, which envision a collaborative process in developing a uniquely suitable educational placement for each child. See 20 U.S.C. § 1415(b)(1); see also 34 C.F.R. 300.322; 8 NYCRR 200.5(d). Predetermination therefore amounts to a procedural violation of Section 1415, and "can rise to the level of a substantive harm, and therefore deprive a child of a [FAPE], where the child's parents are effectively deprived of meaningful participation in the IEP process." J.G. ex rel. N.G. v. Kiryas Joel Union Free Sch. Dist., 777 F. Supp. 2d 606, 648 (S.D.N.Y. 2011). However, where a Parent has actively and meaningfully participated in the development of an IEP, courts have rejected predetermination claims. Id. The CSE may consider and reject the Parent's point of view, but it may not deprive the Parent of meaningful participation by refusing to consider or the Parent's concerns.

The IHO found no evidence that the CSE considered a more restrictive setting for M.K., in doing so denied the Parent of an opportunity to meaningfully participate, and the violation rose to the level of denial of a FAPE. IHO Decision at 11. The SRO disagreed, finding that "evidence in the hearing record shows that the parents attended and participated in the June 2012 CSE meeting," and that the IEP shows the CSE considered

24

other options before choosing the 6:1:1 placement. SRO Decision
at 10. The findings do not speak to each other; the IHO
approached the question on an issue-by-issue basis, finding the
Parent was deprived of a meaningful opportunity to participate
because the CSE did not consider a more supportive environment.
The SRO effectively found other evidence of meaningful
participation, and thus rejected the notion that any failure to
consider this singular issue constituted a procedural violation
of the IDEA. To determine whether deference is owed to the SRO,
it must first be established which administrative adjudicator
applied the correct law.[10]

"Courts often have declined to find predetermination,"
particularly where parents actively participate in the IEP
process. Deal v. Hamilton Cty. Bd. of Educ., 392 F.3d 840, 857
(6th Cir. 2004) aff'd sub nom. Deal v. Hamilton Cty. Dep't of
Educ., 258 F. App'x 863 (6th Cir. 2008) (collecting citations);
see also J.G., 777 F. Supp. 2d 606, 648 (collecting citations).
In Deal, the Sixth Circuit held "[t]he district court erred in
assuming that merely because the Deals were present and spoke at
the various IEP meetings, they were afforded adequate
opportunity to participate." Id. The logic of the Sixth Circuit

---

[10] The DOE argues the IHO and Plaintiff misstate the law. Def.'s
MSJ at 24.

is persuasive. The IDEA explicitly imagines that each child with special needs will receive an appropriate education through the collaborative process between the DOE and the parent(s).[11] See J.G., 777 F. Supp. 2d 606, 648 (S.D.N.Y. 2011). It would run contrary to the spirit of the IDEA to conclude that the DOE is permitted to make some substantive choices about the child's educational needs unilaterally because it has made some other threshold amount of conclusions in consultation with the parent(s). See id. ("The core of the statute is that the development of the IEP be a cooperative process between the parents and the district, and predetermination by a district of a child's IEP undermines the IDEA's fundamental goal to give parents a voice in the educational upbringing of their children." (citations and internal marks omitted)). The CSE must "remain open to changes," including changes to the short list of options mentioned in M.K.'s IEP. See id.

---

[11] For example, in its Findings and Purposes section, the IDEA states: "Almost 30 years of research and experience has demonstrated that the education of children with disabilities can be made more effective by ... strengthening the role and responsibility of parents and ensuring that families of such children have meaningful opportunities to participate in the education of their children at school and at home." 20 U.S.C. § 1400(c)(5)(b). With respect to collaboration, it states "Parents and schools should be given expanded opportunities to resolve their disagreements in positive and constructive ways." Id. at (c)(8).

The DOE and SRO effectively cast the Parent's argument as an objection that the CSE did not adopt her opinion, rather than one related to her meaningful participation. Def.'s MSJ at 26; Def.'s Opp./Reply at 4; SRO Decision at 10 ("While the parents may have preferred the student's then-current staffing ratio, the CSE was not obligated to replicate the services currently received by the student at Rebecca, a non-public school."). Indeed, the DOE had no obligation to replicate the services the Parent preferred. But this conclusion is irrelevant to the proper inquiry: whether the CSE had an obligation to consider that the M.K. needed a more restrictive ratio, and concede that fact if the District's public options were unable to meet M.K.'s needs. If the CSE refused to consider a more restrictive ratio than its public offerings were able to provide, that would amount to predetermination of M.K.'s education program regardless of what M.K. needed or what his Parent contributed to the process.

This inquiry relates solely to the record and thus would ordinarily merit deference to the SRO's findings. However, the SRO's opinion did not analyze the record to determine whether the CSE considered the Parent's point of view that M.K. needed a more restrictive ratio than 6:1:1. The SRO did cite the record

27

to support his conclusions that "the parents attended and participated in the June 2012 CSE meeting" and that "the June 2012 CSE considered other options in New York State's continuum of special education services before recommending placement in a 6:1+1 special class." The first conclusion is, again, irrelevant, as not even the Parent contends that she was denied all opportunity to attend or participate in the CSE meeting at all. The second conclusion is more telling. That the CSE considered "other options in New York State's continuum of special education services" is not the standard, nor is it the Parent's argument. The IDEA does not demand that students with special needs be placed in the best of inappropriate public options. The IDEA demands an appropriate education be offered. Likewise, the statute does not require that a parent's view need only be considered if it is consistent with available public offerings.

Reviewing the SRO's citation to the IEP to support this second conclusion shows that the evidence the SRO relied on shows only that the CSE considered 12:1:1, 8:1:1, and 12:1:4 options, with the first deemed not restrictive enough and the last deemed too restrictive. See Parent Ex. G at 12 (IEP). It is possible that M.K. did not need a 2:1 ratio, and the CSE was not required to adopt the conclusion that he did. But the CSE was

28

obligated to consider the Parent's point of view that a 6:1:1 placement was not appropriate for M.K. and 2:1 was necessary, particularly in light of the fact that M.K. was then being educated in a 2:1 ratio.

In light of the fact that the SRO failed to analyze the record to answer the relevant question of whether the Parent was denied meaningful opportunity to participate with respect to her concern that M.K. required a more restrictive setting than 6:1:1, the SRO's finding is not supported by a preponderance of the relevant evidence. The SRO's reasoning supporting the conclusion is therefore neither persuasive nor consistent with the proper inquiry, the Court declines to defer to the SRO's conclusion.

The IHO compared the testimony of Dr. Czarnecki, who testified that a 6:1:1 program was appropriate, and that of Ms. Mucherino and Ms. McCourt, who testified that M.K. needed a very small ration, such as 2:1. IHO Decision at 11. The IHO determined that "in this instance, the CSE failed to consider the parents' concerns regarding the restrictiveness of the student's recommended placement, and that such failure denied the parents opportunity to participate in the formation of their son's education plan." IHO Decision at 11. The IHO concluded

that this violation alone rose to the level of a FAPE violation. Id. The conclusions were based on the fact that the IHO found "no evidence that the CSE considered a more restrictive setting for M.K.," and "in light of the student's then-placement at the Rebecca School, the CSE should have considered increased levels of support for M.K. IEP recommendations need to be based on the student's individual needs." Id. The IHO therefore performed the proper analysis, asking whether the CSE considered the Parent's concern regarding this issue, and if not, whether that failure in context of what the CSE did or did not consider amounted to a denial of the Parent's opportunity to participate. The Court finds this analysis both persuasive and well-considered, and accordingly defers.

An independent review of the record also demonstrates that the District did not enter the IEP with an open-mind as to what was appropriate for M.K., but was rather predetermined as bound by the few options cited in the IEP. Accordingly and as reasoned above, the Parent was denied an opportunity to meaningfully participate when the CSE failed to consider her point of view that M.K. required a more restrictive setting than 6:1:1, in violation of the IDEA.

### 2. The Procedural Violations Each Amount to Denial of FAPE

"Procedural flaws do not automatically require a finding of a denial of a FAPE, but procedural inadequacies that individually or cumulatively result in the loss of educational opportunity or seriously infringe on a parent's participation in the creation or formulation of the IEP constitute a denial of FAPE." W.S. ex rel. C.S. v. Rye City Sch. Dist., 454 F. Supp. 2d 134, 138 (S.D.N.Y. 2006). The individual procedural violations in this instance seriously infringed on either the Parent's right to participate, M.K.'s right to a FAPE, or both.

Notice is a cornerstone of fair process, and the DOE played so fast and loose with this procedural requirement that the Parent was left with no time to get her literal house in order, to make the difficult decision of whether to arrange for other options for a child with disproportionately high needs, to challenge the Government's decision with a full understanding of the risks, or to otherwise adapt to accommodate the DOE's choice. Accordingly, the Parent was denied a right to meaningfully participate in the process, and M.K. was ultimately denied an appropriate education. The inadequacy of the BIP denied M.K. his right to a fully informed IEP process, and

31

ultimately an appropriate education suited to his behavioral
needs. Likewise, predetermination of the issue of
restrictiveness of placement denied both the Parent her right to
meaningfully participate in the IEP process, and M.K. the right
to an appropriate placement.

## B.    The IEP is Not Reasonably Calculated to Enable M.K. to Receive Educational Benefits

Plaintiff submits that the goals of the IEP were
substantively inappropriate for M.K.'s 2012-2013 school year for
two reasons: (1) the goals were written for the DIR methodology,
but the DIR methodology was not adopted; and (2) the goals were
based on an outdated report of M.K.'s behavior and progress.

The IDEA prescribes that an IEP must include "a statement
of measurable annual goals, including academic and functional
goals, designed to (aa) meet the child's needs that result from
the child's disability to enable the child to be involved in and
make progress in the general educational curriculum; and (bb)
meet each of the child's other educational needs that result
from the child's disability." 20 U.S.C. §
1414(d)(1)(A)(i)(II)(a)-(b). "[A] school district complies with
IDEA's substantive requirements if a student's IEP is

32

"reasonably calculated to enable the child to receive educational benefit[s]." Cerra v. Pawling Cent. Sch. Dist., 427 F.3d 186, 194 (2d Cir. 2005). However, it is the District's burden to demonstrate the appropriateness of the IEP. M.H., 685 F.3d at 225; see also T.K., 2016 WL 229842, at *4; C.F. ex rel. R.F. v. New York City Dep't of Educ., 746 F.3d 68, 76 (2d Cir. 2014).

With respect to methodological appropriateness, Plaintiff argues that the goals set in the IEP were lifted from the Rebecca School's plan for M.K., but the means by which the Rebecca School set out to accomplish those goals (specifically, the "DIR methodology") was not a part of the IEP. Pl.'s MSJ at 19-22. Plaintiff does not argue that the DOE was required to adopt the Rebecca School methodology, but rather that divorcing the Rebecca School goals, which were formulated specifically for implementation using DIR methodology, resulted in inappropriate goals. Id. The IEP could either take the Rebecca School goals and method, or neither. With respect to the temporal appropriateness of the goals, Plaintiff points out that the IEP goals were developed using a December 2011 progress report for M.K., and argues that his progress between December 2011 and June 2012 was not considered. Pl.'s MSJ at 23-24.

33

The SRO found the goals appropriate, holding that there was inadequate evidence to find the CSE relied on an outdated progress report, because the "updated progress report was not available at the time of the June 2012 CSE meeting." SRO Decision at 11. The SRO rejected the methodology argument on the grounds that "the mere presence of [DIR nomenclature] within four annual goals does not render these goals. . . inappropriate" and the goals could be implemented using other methodologies. SRO Decision at 11.

The Court finds the SRO's analysis on the issue of the progress report unpersuasive and inadequately reasoned. Whether a more timely report was available is irrelevant to whether reliance on an outdated report resulted in appropriate goals. The SRO aptly cited as much in the decision's Applicable Standards section: "An appropriate educational program begins with an IEP that includes a statement of the student's present levels of academic achievement and functional performance." SRO Decision at 8 (citing 34 C.F.R. 300.320(a)(1); 8 N.Y.C.R.R. 200.4(d)(2)(i); Tarlowe v. New York City Bd. of Educ., 2008 WL 2736027, at *6 (S.D.N.Y. July 3, 2008)) (emphasis added). Yet this standard, its reasoning, and substantive analysis of the appropriateness of the December 2011 goals are notably absent from the SRO's findings. In fact, the SRO's holding on this

34

issue runs quite contrary to the cited principle, amounting to an unreasoned proclamation that the DOE is permitted to provide a free but nonetheless inappropriate public education because it doesn't possess a report to easily craft an appropriate one. In so holding on the basis of this implied and irrelevant factor, the SRO rejected the IHO's carefully considered analysis on the correct issue—whether the goals were appropriate given they were based on a report that did not account for six months of progress. Accordingly, the SRO's determinations merit minimal deference, and the Court considers the IHO's analysis, which is informed by a deeper understanding of educational policy than the Court's. See M.H., 685 F.3d at 246.

The IHO found both of Plaintiff's goals arguments persuasive. The IHO found that in "comparing [the goals] with the Interdisciplinary Report" it was clear "the CSE failed to take into account M.K.'s progress between December 2011 and June 2012, and therefore developed goals that did not meet his present levels of performance." IHO Decision at 10. Noting that the December 2011 progress report (like all of the Rebecca School's reports) was specifically designed to provide six-month goals, the IHO looked to whether the goals were inappropriate.

The IHO credited the testimony of Ms. Mucherino,[12] "that the goals the CSE were putting into the IEP were inappropriate." IHO Decision at 10; Tr. at 42:1-2, 132:2-4. Accordingly, the IHO held that the CSE failed to take in to account M.K.'s progress between December 2011 and June 2012. IHO Decision at 10.

Defendant submits that its own employee, Dr. Czarnecki, testified that the IEP's goals were based on current information about M.K.'s progress based on discussions with school staff prior to the meeting, and no more recent report existed. Def.'s MSJ at 29-30. Dr. Czarnecki based his opinion on discussions with Rebecca School staff, and had no familiarity with M.K. outside of his work participating in the IEP meeting. Id.; Jan. 28, 2013 Tr. 75:18-21. Considering this second-hand opinion conflicts with the testimony of the individual most familiar with M.K.'s progress in the classroom, Defendant's argument is unpersuasive. Whether Ms. Mucherino objected to the goals when they were read is irrelevant to whether those goals were appropriate. It is the Department's burden to create an appropriate educational plan and placement for M.K., regardless of whether his private placement educators were ideally

---

[12] Given Ms. Mucherino was well-informed by nature of her position and interaction with M.K. to assess the appropriateness of his education goals, the Court defers to the IHO's credibility determination.

communicative.

The Court finds the IHO's analysis on this issue
persuasive. The "likely to produce progress" bar is low, but it
is nonetheless the DOE's obligation to meet. By using goals that
were designed to expire by the time the IEP was to implement
them (for a full year thereafter), the DOE has not shown that
the IEP was likely to produce progress. Considering the finding
that the CSE relied on the December 2011 Report, the December
2011 Report was specifically designed with a six-month shelf-
life, and the fact that the CSE was designing an education
program to serve M.K. through 2013, the Court finds that the DOE
has failed to demonstrate that the IEP substantively
appropriate.[13] Accordingly, the substance of the IEP denied M.K.
a FAPE.

## C.   The Rebecca School is Appropriate for M.K.'s Needs and
Equitable Considerations Favor Reimbursement

"Parents bear a lower burden to demonstrate the

---

[13] Being that this ground provides adequate reason to find the
DOE has failed to establish substantive appropriateness of the
IEP, the Court does not reach the issue of whether the SRO is
due deference regarding whether Rebecca School goals are
substantively appropriate without inclusion of the DIR
methodology.

appropriateness of a private placement than school districts do
to demonstrate the provision of a FAPE because 'parents are not
barred from reimbursement where a private school they choose
does not meet the IDEA definition of a [FAPE].'" T.K., 2016 WL
229842, at *5 (quoting Frank G., 459 F.3d at 364). Parents meet
the appropriateness standard by demonstrating "that the
placement is reasonably calculated to enable the child to
receive educational benefits," not that the placement meets the
IDEA or "furnishes every special service necessary to maximize
their child's potential." T.K., 2016 WL 229842, at *6 (citing
Frank G., 459 F.3d 364-5) (internal quotation marks omitted).


The SRO did not reach the issue of the appropriateness of
the Rebecca School. SRO Decision at 16. The IHO analyzed this
question in detail, concluding that "[t]he evidence shows...that
M.K. received individualized, adapted lessons from his teachers
at the Rebecca based on his needs." IHO Decision at 14. The IHO
discussed M.K.'s progress in multiple areas as noted in the
December 2012 progress report, and as shown by the evidence
presented at the hearing. Id. at 14-15. Given that the SRO did
not reach a conclusion to which the Court can defer, the Court
pays due deference to these well-reasoned findings and the
persuasive reasoning of the IHO, who is more equipped to assess
the appropriateness of a placement than the Court. K.S. v. New

York City Dep't of Educ., No. 11 CIV. 7443 DAB, 2012 WL 4017795, at *7 (S.D.N.Y. Aug. 8, 2012) ("Because administrative agencies have special expertise in making judgments concerning student progress, deference is particularly important when assessing the [placement]'s substantive adequacy." (citing Cerra, 427 F.3d at 195); see also M.H., 685 F.3d at 246 ("in reviewing the SRO's decision, the court often relied on the carefully articulated contrary observations, insights, and conclusions of the IHO. We think that to have been entirely proper.").

The DOE submits that the Rebecca School was inappropriate for M.K. for the 2012-2013 school year because the Rebecca School's program did not mirror the IEP. Def.'s MSJ at 34-5. Defendants misstate the standard. See T.K., 2016 WL 229842, at *5. Notwithstanding that reimbursement was denied in each case the DOE cites, these cases all utilize the standard that Parents must show the unilateral placement was designed to meet the student's education needs, not that Parents must show the placement was designed to meet the IEP's dictates. See R.S. ex rel. A.S. v. Lakeland Cent. Sch. Dist., No. 09 CIV. 9874 JGK, 2011 WL 1198458, at *5 (S.D.N.Y. Mar. 30, 2011) aff'd sub nom. R.S. ex rel A.S. v. Lakeland Cent. Sch. Dist., 471 F. App'x 77 (2d Cir. 2012) ("The plaintiffs have not satisfied their burden of showing that A.S.'s placement at Kildonan was specifically

designed to meet his unique needs." (emphasis added)); K.S., No. 2012 WL 4017795, at \*7 ("The issue turns on whether a placement—public or private—is reasonably calculated to enable the child to receive educational benefits. ... an appropriate private placement need not meet state education standards or requirements." (internal quotation marks, brackets, and citations omitted)). Furthermore, where the Rebecca School's program differs materially from the IEP's mandates, Plaintiff has pointed out these elements of the IEP were either unexplained or superfluous given the Rebecca School's other services and methods. Pl.'s Opp./Reply at 11-12.

Deference to the IHO's finding is sufficient to meet the Parent's burden of demonstrating the appropriateness of the private placement. Furthermore, the Rebecca School is specifically tailored to meet the educational needs of children with neurodevelopmental delays, such as M.K.'s autism. Pl.'s MSJ at 26. That the CSE saw fit to use the Rebecca School's goals implicitly admits the competency of the Rebecca School in educating and determining goals for a child such as M.K., though those goals were temporally inappropriate for M.K.'s 2012-2013 school year. A close review of progress report on which the CSE itself relied records M.K.'s behavioral and educational progress at the Rebecca School. Def.'s Ex. 6. For example, the Report

states: "Over the past few months, we have seen changes in the frequency and amount of time that [M.K.] is dysregulated." Id. at 1. "In September, [M.K.] was beginning to recognize several meaningful words ... [n]ow, he is able to recognize other emotionally meaningful words." Id. at 3. "[M.K.] has continued to work on identifying numbers," "identifying [a] pile of items," and "increased his ability to complete obstacle courses that utilize positional vocabulary." Id. The Report describes in detail the progress M.K. had been making under the Rebecca School's tutelage and methodology, toward educational, functional development, occupational therapy, speech-language therapy, and mental health goals. Id. Where M.K. had not made progress at the time of the report, a strategy and plan was articulated.

Plaintiff also points to M.K.'s continued progress in a laundry list of these areas after the December 2011 progress report, including but not limited to the areas of dysregulation, running out of the classroom, communication, mathematical concepts, auditory processing, and visual-spacial processing. Pl.'s MSJ at 26-30. Plaintiff further identifies areas where the Rebecca School is uniquely able to serve M.K.'s needs, such as his sensory diet, community outings, and a motivating

41

environment in which M.K. was comfortable. Id. Defendant does
not dispute these facts establishing M.K.'s progress. It is
clear from the record that the Rebecca School placement is
reasonably calculated to enable M.K. to receive educational
benefits, and indeed that he had been progressing at the time of
the IEP's proposed change in placement.


    A balancing of the equities favors reimbursement. "[T]he
court enjoys broad discretion" in considering equitable factors
relevant to fashioning relief. Florence Cty. Sch. Dist. Four v.
Carter By & Through Carter, 510 U.S. 7, 16, 114 S. Ct. 361, 366,
126 L. Ed. 2d 284 (U.S.S.C. 1993) (citing Sch. Comm. of Town of
Burlington, Mass. v. Dep't of Educ. of Mass., 471 U.S. 359, 374,
105 S. Ct. 1996, 2005, 85 L. Ed. 2d 385 (1985)). The record does
not show any obstruction or intransigence to participate in the
DOE process on the part of the Parent that would justify finding
reimbursement inequitable. The worst of the Plaintiff's fouls is
that she mailed her rejection of the DOE's placement on July 17,
2002. Pl.'s MSJ at 31. In light of the DOE's consistently
untimely scheduling, this is hardly enough to find reimbursement
inequitable. Moreover, the Parent has represented to the Court
that she was unable to visit P168X until July 13. No evidence
tends to show the delay was in bad faith. Moreover, Plaintiff is

42

a single-parent with two children, and nonetheless clearly has participated to her fullest ability in finding a suitable placement for M.K. It is therefore sufficiently clear the Parent's minor delay was for good cause. Furthermore, the Parent's income is less than the cost of M.K.'s tuition. Pl.'s MSJ at 32. For all these reasons, the equities favor reimbursement.

This case concerns the 2012-2013 school year. However, it is also worth noting that M.K. has attended the Rebecca School since 2009, consistent with findings in his favor from every IHO who has heard his case. Yearly review generally protects both the DOE and the child. It reserves reimbursement for the cases in which it is truly necessary, and ensures that students with special needs are supported in their educational growth and may experience the social benefits of communal education with differently-abled peers. However, at some point, this safety mechanism can force a hard-pressed Parent to defend her child's right to an appropriate education once a year with the only relief being the moment her child ages out of the public system of support entirely. A record that suggests different yearly conclusions -one year the parties settle, another the IHO finds in M.K.'s favor and the DOE declines to appeal, another year the parties exhaust all adjudication forums, and around again- does

43

not serve the best interests of the parties or the child who struggles to maintain a calm composure on a minute to minute basis in his environment.

## V.    Conclusion

Based on the conclusions set forth above, Plaintiff's

motion for summary judgment is granted and Defendant's motion

for summary judgment is denied. Accordingly, the ruling of the

SRO is reversed.

It is so ordered.

**New York, NY**
**February /6 , 2016**

ROBERT W. SWEET
U.S.D.J.